1

2

3

4

5

6

7

8

9              IN THE UNITED STATES DISTRICT COURT

10                 FOR THE DISTRICT OF OREGON

11  GARY JENKINS, o/b/o N.J., a      )
    minor child,                     )
12                                   )
               Plaintiff,            )    Civil No. 04-202-HU
13                                   )
          vs.                        )
14                                   )
    JO ANNE BARNHART,                )    FINDINGS AND RECOMMENDATION
15  Commissioner of Social Security, )
                                     )
16             Defendant.            )
    _____)
17
    Phyllis Burke
18  4370 N.E. Halsey Street
    Portland, Oregon 97213
19
          Attorney for plaintiff
20
    Karin Immergut
21  United States Attorney
    District of Oregon
22  Craig J. Casey
    Assistant United States Attorney
23  888 S.W. Fifth Avenue, Suite 1000
    Portland, Oregon 97204-2024
24
    Leisa A. Wolf
25  Special Assistant United States Attorney
    701 Fifth Avenue, Suite 2900 MS/901
26  Seattle, Washington 98104

27        Attorneys for defendant

28  / / /


    1 - FINDINGS & RECOMMENDATION

HUBEL, Magistrate Judge:

Nicholas Jenkins is a child seeking disability benefits. His father, Gary Jenkins, brought this action pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), to obtain judicial review of a final decision of the Commissioner of the Social Security Administration (Commissioner) denying Nicholas's application for Supplemental Security Income (SSI) disability benefits. The parties agree that the case should be reversed and remanded; the only issue for the court is whether the remand should be for further administrative proceedings or for a finding of disability and award of benefits.

## Procedural Background

Mr. Jenkins filed an application on Nicholas's behalf on September 4, 1992, seeking child's SSI disability benefits and alleging mental impairments. The application was granted and Nicholas received benefits until a redetermination pursuant to the provisions of P.L. 104-193 found him not disabled as of September 25, 1997. The determination was upheld by a state agency disability hearings officer on December 31, 1998. On March 31, 2000, after a hearing, Administrative Law Judge (ALJ) Joseph Schloss issued a decision upholding termination of Nicholas's benefits.

In June 2001, the Appeals Council vacated the decision and remanded the claim, with instructions that the ALJ obtain supplemental medical expert testimony to clarify the nature and severity of Nicholas's impairments, and to reevaluate Nicholas's subjective complaints and his parents' testimony.

A second hearing was held before a different ALJ, Jean Kingrey, on July 18, 2002. However, as the Commissioner acknowledges, ALJ Kingrey failed to obtain the supplemental medical

2 - FINDINGS & RECOMMENDATION

expert testimony ordered by the Appeals Council. Nicholas and his parents testified. On September 27, 2002, ALJ Kingrey issued a decision finding that Nicholas did not satisfy the criteria for childhood SSI disability at any point between September 25, 1997 and the date of her decision. On December 11, 2003, the Appeals Council denied Nicholas's request for review, thereby making ALJ Kingrey's decision the final decision of the Commissioner.

## Medical Evidence

Nicholas was born on May 25, 1985. On July 1, 1990, while riding a bicycle, Nicholas was hit by a van. He suffered a closed head injury, with cerebral contusion and linear skull fracture, and was in a coma for four days. Tr. 440. After the accident, he had episodic loss of vision in the left eye, was highly susceptible to fatigue, and was reported to be uneasy in group situations. Tr. 446. His parents reported that he was also more emotionally labile.

Nicholas was evaluated by psychologist Edwin Pearson, Ph.D in September and October 1992. Tr. 445. Dr. Pearson administered, among other tests, the Wechsler Intelligence Scale for Children (WISC-R),[1] and the Wide Range Achievement Test, 1984 edition, Level 1 (WRAT). The test data indicated that Nicholas's intellectual functioning was in the average range, with a verbal IQ of 88, a performance IQ of 106, and a full scale IQ of 96. Tr. 447. His academic abilities, as indicated on the WRAT, were unevenly

---

[1] The parties agree that Dr. Pearson administered a version of the WISC-R that was a year out of date in 1992. The WISC-R was developed in 1974, and the WISC-III became available in 1991. It is recommended that psychologists adopt the new testing method within one year of its issuance. The WISC-III was superseded in 2003 by the WISC-IV. See Defendant's Memorandum in Support of Remand, at 7, n. 6.

3 - FINDINGS & RECOMMENDATION

developed: reading and spelling scores were in the mid- to upper first grade level, but his arithmetic scores were below first grade level, in the first percentile.

Dr. Pearson noted attentional problems "virtually throughout all areas tested." Tr. 449. Nicholas had difficulty listening quietly to instructions and maintaining attention; he was easily distracted. Id. Tests of immediate auditory and visual memory showed erratic performance. Id. Dr. Pearson concluded that Nicholas had 1) moderate deficit in attentional control and concentration, with moderate to severe vulnerability to distraction; 2) moderate difficulties in learning and retaining new information, being highly erratic in his efforts to assimilate new information; 3) mild visuographic deficit; 4) moderate deficits in novel problem solving and higher reasoning; and 5) moderate deficits of frontal lobe/executive function nature, including perseveration, impulsivity and emotional lability. Dr. Pearson also found other problems such as urinary urgency, episodic lower left extremity dyscontrol, episodic loss of vision in the left eye, fatigue, episodic depression, loss of self-esteem, and a need to withdraw from group peer activities because they were overstimulating and confusing. Tr. 451-52.

On January 13, 1993, a Social Security medical consultant, Mary Ann Westfall, M.D., wrote that two years after the closed head injury, Nicholas

> has not progressed cognitively since that point - has wide variance in academic skills acquisition, e.g., math vs. reading & comprehension - exhibits inconsistency in approaches to problem solving, demonstrating continued ADHD characteristics - will continue to do so in future - will not be at peer level (cognitively, or grade level).

4 - FINDINGS & RECOMMENDATION

Tr. 77.

Dr. Pearson evaluated Nicholas again on July 28, 1997, after he completed fifth grade. Tr. 440-44. He again administered the WISC-R (now six years out of date) and the WRAT, along with other neuropsychological tests. On the WISC-R, Nicholas obtained verbal, performance, and full scale IQ scores of 81, 88 and 84, respectively. His academic skills on the WRAT were at third grade level for reading and spelling and at the lower sixth grade level on arithmetic. Dr. Pearson concluded that these tests indicated borderline intellectual functioning and a cognitive disorder. Tr. 444. Dr. Pearson thought Nicholas also had Attention Deficit/Hyperactivity Disorder (ADHD). During testing, Nicholas was restless, impulsive, inattentive, and easily distracted. Id.

A report from Nicholas's teacher, dated May 19, 1998, described him as "short attention, no focus, easily distracted," and said that he was able to remain on task only about three to five minutes before becoming distracted or needing redirection. Tr. 291. The teacher reported that Nicholas was disruptive during class times, did not learn new skills at the same pace as his peers, and did not react appropriately with his peers. Tr. 291-92. He was described as acting without thought, being impulsive, unruly, overactive, very busy, aggressive, and loud. Tr. 292.

Nicholas's school records from Brixton Junior High School show that on November 9, 1998, Nicholas was disciplined for harassment after he made inappropriate sexual comments to a girl student. Tr. 505. On March 5, 1999, Nicholas was disciplined for bringing a squirt gun to his P.E. class. On March 30, 1999, Nicholas was disciplined for disruptive behavior and harassment, after he

5 - FINDINGS & RECOMMENDATION

provoked his friend into punching another student. Tr. 502. On April 2, 1999, Nicholas received a referral for failing to report to detention after school on April 1, 1999. Tr. 501. On April 4, 1999, Nicholas's parents were notified that Nicholas had accumulated an excessive number of absences from class. Tr. 498. On April 16, 1999, Nicholas was suspended from school for fighting. Tr. 499. On April 26, 1999, he received a referral for insubordination after he refused to participate in class. Tr. 497. On May 3, 1999, he was suspended for slapping a girl in the face. Tr. 496. A grade report dated August 30, 1999, when Nicholas had completed the eighth grade, shows that Nicholas received grades of D- and F in English, an F in literature, two Fs in math, a C and an F in social studies, a D- in science, and a D in health. His cumulative grade point average was 1.286. Tr. 667.

On November 4, 1999, the principal of Ponderosa Junior High School notified Nicholas's parents of evaluation results in connection with the provision of Section 504 services. Tr. 543. He wrote:

> The committee concluded that Nick is having a difficult time staying focused in class. He has a tendency to get off task and is easily distracted. It was noted that Nick seems to experience most of his success when he is separated in the class from his "friends." He works better and completes assignments when this occurs. For the most part, Nick has difficulty in completing his assignments and often comes unprepared for class. This contributes to his reduction in grades in his classes.

Tr. 544.

A summary of student discipline involving Nicholas for the 1999-2000 school year shows detentions on September 15, 1999, for disturbing class; on September 17, 1999, for "other;" on October 6, 1999, for disturbing class; on October 7, 1999, for "other;" on

6 - FINDINGS & RECOMMENDATION

December 16, 1999, for attendance; on February 10, 2000, for inappropriate language; on February 18, 2000, for insubordination; on May 2, 2000, for "other;" and on May 4, 2000, for lewd conduct. Tr. 672.

In February 2000, Stephen Tibbitts, Ph.D. was called to testify as a medical expert at Nicholas's first hearing before ALJ Schloss. Tr. 838-44. He reviewed Dr. Pearson's 1997 report. When asked to assess the impairments indicated by Dr. Pearson's report, Dr. Tibbitts stated that the report showed a "marked" impairment in concentration, persistence and pace, but "less than marked" limitations in personal attainment, cognitive and communication skills, and social realm. Tr. 838-39.

Dr. Tibbitts evaluated Nicholas on July 27, 2000. Tr. 709-13. He administered the WISC -III and a group of achievement tests called the MBA tests. The WISC-III yielded a verbal IQ score of 69 (second percentile), a performance IQ of 73 (fourth percentile) and a full scale IQ of 69 (second percentile). According to Dr. Tibbitts, the verbal and full scale scores fell within the mentally retarded range and the performance scale fell in the borderline range. Tr. 711. The difference between his verbal and performance scores "was not significant." Id. The sub-test scaled scores were "fairly consistent at the low level." Id.

Additional analysis of the WISC-III data showed that Nicholas was also experiencing "significant problems" across all four cognitive realms: verbal comprehension, perceptual organization, freedom from distractibility, and processing speed.

The MBA scores, when estimated at grade level, were grade 4.5 for basic skills, grade 5.6 for reading, grade 3.3 for writing, and

7 - FINDINGS & RECOMMENDATION

grade 5.3 for mathematics. At the time of the testing, Nicholas's

actual grade level was 8.9. Tr. 712. Dr. Tibbitts also noted,

> Nicholas appeared to have age appropriate activities of
> daily living. His grooming and hygiene were appropriate
> and he is able to participate in some household
> responsibilities. He appeared to have serious problems in
> his social functioning, with a tendency to have
> difficulty with both peers, as well as adult authority
> figures. Reports from his school indicated that he
> generally is confrontive and has received numerous
> detention referrals for hitting and throwing. His
> concentration, persistence and pace appeared to be
> seriously impaired. He has difficulty with [his] auditory
> attention and concentration and is significantly below
> grade level in his academic achievement. Behavioral
> problems appear primarily in the area of anger and acting
> out behaviors.

Id. Dr. Tibbitts diagnosed Mild Mental Retardation and Disruptive

Behavior Disorder, Not Otherwise Specified (NOS).

According to a report completed on November 7, 2000, by a

counselor at Mazama High School, Nicholas was able to maintain

concentration during "seat work" periods; was not disruptive during

class time, reacted appropriately to peers, followed rules and

directions appropriately, and socialized well between classes or at

lunch. Tr. 639-41. However, the counselor also noted, "I also

notice very low (single digit) %ile scores on achievement tests."

Tr. 642.

A reviewing physician for Social Security Administration,

Frank Lahman, Ph.D., who was consulted on November 17, 2000, opined

on the basis of the November 7, 2000 report that

> The claimant is performing at the 9th grade level. His
> 504 plan is reportedly based on "extreme/serious medical
> circumstances." Evidence at the time of the initial eval
> [sic] showed achievement to be at the borderline level.
> ... Based on the claimant's adaptive functioning, school
> achievement and collective test results, the [diagnosis]
> of Borderline Intellectual Function is more appropriate
> than the Mild Mental Retardation that Dr. Tibbits [sic]
> concluded. The school principal's letter of 11/4/99 noted

8 - FINDINGS & RECOMMENDATION

that the claimant had a difficult time staying focused in class and was easily distracted. The current teacher report reflects improvement in this domain so I have reduced the severity on CPP [concentration, persistence and pace] to "Less than Marked."

Tr. 715.

A grade transcript dated September 4, 2001, shows that for the latter half of the 2000-2001 school year, Nicholas's grade point average was 1.5. Tr. 751. However, for the first half of the 2001-2002 school year, his grade point average had risen to 2.167. Id.

A school report dated January 16, 2002, when Nicholas was a sophomore in high school, stated that he was on an Individual Education Plan and needed support in the Resource Room to be successful in mainstream classes. Tr. 743. At that time test results indicated that he was functioning at grade 6.7 in math, 6.5 in reading, and 4.6 in written language skills. Id. Although he was in an algebra class, Nicholas was having difficulties with "fractions, percentages, and story problems." Id.

During 1992 and 1993, and again in 1997, Nicholas was treated by neurologist Michael S. Narus, D.O., and by Charles D. Bury, M.D., with Ritalin. However, the treatment was not successful. Nicholas was started on Prozac in 1998, tr. 134, and then on Cylert in 1999. Tr. 477. However, in 1998, pediatric neurologist Steven Ireland, M.D., wrote that he doubted "medical therapy will be terribly effective in either helping with his academic performance or controlling his behavior," because Nicholas's problems were related to a post-traumatic encephalopathy. Tr. 474.

On March 26, 1998, Nicholas's family physician, Charles A. Huibregtse, M.D., Ph.D., made an incidental finding of marked dextroscoliosis in the upper thoracic spine from about T1-T7. Tr.

9 - FINDINGS & RECOMMENDATION

479. Physical examination revealed a prominent hump on the right upper back, the right shoulder sitting higher than the left when standing straight. Id. On flexion, his spinous processes made a definite curve to the right in the upper spine. Id.

Dr. Huibregtse referred Nicholas to Karl C. Wenner, M.D., an orthopedist, for evaluation of scoliosis. Tr. 729. Nicholas was found to have a significant thoracolumbar double curve, with the larger being the thoracic, measuring roughly 32-35°. Id. On March 30, 1998, Dr. Wenner wrote:

> I am concerned that this is not idiopathic scoliosis because of his age and presentation. Scoliosis is much more common in females, and when it occurs in males it is not usual for me to see it at this age. I am concerned that there is some other process going on, and I wonder if it may in some way be related to his head injury with some neurological sequela that I am not able to pick up. In any event, I think he is going to need to be treated regardless of the etiology... and because of my concerns I am referring him to Shriner's ... and have him evaluated there at the Scoliosis Clinic. I suspect at the very least he will require bracing, and possibly may be a surgical candidate, given his young age.

Tr. 454.

At Shriners, Nicholas was fitted for a Milwaukie brace. Tr. 462. He was told by Michael Aiona, M.D., an orthopedist, that he needed to wear the brace 23 hours a day until he reached skeletal maturity at the age of 16 or 17. Tr. 459.

On December 5, 1998, Nicholas was seen by Dr. Aiona and James Policy, M.D., for complaints of pain from the brace. It was noted that the brace was "much too tight" and Dr. Policy recommended that the brace be refitted or replaced. Tr. 507.

On January 13, 1999, Nicholas complained of back pain over the last two or three weeks while wearing the brace. Tr. 511. Physical examination revealed tenderness to palpation in the trapezius

10 - FINDINGS & RECOMMENDATION

muscle on the right and along the vertebral column. Range of motion was limited and bending forward caused pain. Id.

On July 9, 1999, Dr. Aiona reported in a letter that Nicholas had been followed for a curvature of the spine which had progressed from 31 degrees to 40 degrees in the previous six months. Tr. 516. He noted that the brace affected some of Nicholas's physical activities, as it limited truncal and pelvic motion. Id. Dr. Aiona indicated that depending on his progress, Nicholas might be a candidate for spine surgery in the future. Id.

On January 27, 2000, an x-ray showed that Nicholas's thoracic dextroscoliosis had increased from 40 to 44 degrees. Tr. 726. On February 9, 2000, an MRI showed an intradural extraaxial cystic lesion at T1, compressing the spinal cord with posterior and rightward displacement of the cord. Tr. 725.

On February 19, 2000, Dr. Aiona stated in a letter that Nicholas had continued to have progression of the scoliosis despite brace treatment, and that he had what was probably a cystic lesion causing pressure on his spinal cord. Tr. 548. Dr. Aiona thought the lesion would require neurosurgical evaluation and treatment, as well as affecting the overall treatment of his scoliosis. His diagnoses at that time were scoliosis and probable arachnoid cyst, causing functional problems with back pain, the need for bracing, and possible surgical intervention. Id.

On April 14, 2000, Nicholas saw Joseph Piatt, M.D., a neurosurgeon. Tr. 706. After examination, Dr. Piatt noted an impression of ventral spinal cyst with deformation of the spinal cord and progressive scoliosis. Id. Dr. Piatt thought the cyst was either an arachnoid cyst or a neurenteric cyst. Id. Dr. Piatt

11 - FINDINGS & RECOMMENDATION

recommended excision of the cyst for biopsy and for "whatever benefit spinal cord decompression may have with respect to Nicholas' scoliosis." Id.

In November 2000, the cystic tumor was removed by Nate Selden, M.D. Tr. 697-98, 732, 736. On December 14, 2000, six weeks after surgery, Nicholas was examined by Dr. Krajbich and Elaine Jeffress, RN. Upon examination, some tenderness was noted with mild palpation around both scapular regions, along with some numbness of the chest. X-rays showed that Nicholas's spinal curve was 36°. Tr. 735. It was felt that his scoliosis had improved since removal of the cyst. Tr. 736.

On November 8, 2001, Nicholas was seen by Patrick Dawson, M.D. at Shriner's Hospital. Dr. Dawson noted that he had full forward flexion and extension of the spine and good rotation. Tr. 732. He had a notable scoliotic curve, but full range of motion and good strength in all extremities. X-rays showed his spinal curve at 43°. Id. He was referred to a physical therapist for back exercises to help with the mid-thoracic back pain. Id.

On July 11, 2002, Dr. Krajbich noted that Nicholas had a 43° upper thoracic curve which was "somewhat symptomatic, but not too dramatically." Tr. 753. His curvature had been "stable for the past little while," but Dr. Krajbich planned to see him again in six to eight months to see if he would require surgical procedure for correction. Id.

### Hearing Testimony

Nicholas testified at the hearing that he had completed his sophomore year of high school, with grades including two Ds, an F and "a couple of Cs." Tr. 765. He spends five hours a week in a

12 - FINDINGS & RECOMMENDATION

special education class, in which he gets academic help. Tr. 768. The previous year, he had taken a regular algebra class, getting Cs and a D; Nicholas attributed the D to not turning in all his assignments. Tr. 769. He said he got a D or an F in biology, not for failing to turn in assignments, but because the class was beyond his abilities. Tr. 769-70. He got Bs in English and social studies. Tr. 770. During his leisure time, he watches television and plays video games. Tr. 771-72.

Nicholas testified that he fails to turn in assignments because "either I don't know how to do it, or I get discouraged." Tr. 773. He said he gets discouraged after 15 or 20 minutes. Id. He has not participated in sports since the eighth grade because "my back hurts too bad." Tr. 777. He testified that when he was wearing the brace he could not bend over to tie his shoe. Tr. 779.

Nicholas's father testified that Nicholas's physical activities, such as walking, are limited by pain, and that he was frequently going to the nurse's office at school for Tylenol. Tr. 787. Nicholas takes his father's pain medication. Id. He said Nicholas does not pay attention or concentrate very well. Tr. 792.

Nicholas's mother testified Nicholas stays home a lot, playing video games, spending the majority of his day in his room. Tr. 800. She said he also has learning difficulties and gets frustrated and upset with school work. Tr. 802. He often does his homework in a resource room. Tr. 803.

**ALJ's Decision**

The ALJ found that Nicholas has severe impairments that include ADHD, borderline IQ, and serious scoliosis complicated by the presence of a spinal cyst. Tr. 25. She further found that

13 - FINDINGS & RECOMMENDATION

Nicholas exhibited certain mental difficulties including substandard academic performance, attention and concentration deficits, and anger and impulse control problems.

The ALJ found that Nicholas did not suffer serious functional consequences resulting from his spinal abnormality. Id. She concluded that the scoliosis did not meet or equal the orthopedic impairments listed in Sections 1.00 and 101.00 of the Appendix, or cause a "marked" impairment in any functional sphere. Tr. 26.

The ALJ found that the "record on balance" did not support Dr. Tibbitts' 2000 diagnosis of mild mental retardation, and concluded that Dr. Pearson's 1997 findings, with scores at the upper end of the "borderline" range, should be applied. Tr. 26. The ALJ found that the verbal and full scales on the 2000 IQ test, at 69, were only one point below mild mental retardation scale, within the "typical range of standard deviation in such tests [of] plus or minus two or three points." Id. The ALJ also found Dr. Tibbitts' diagnosis to be inconsistent with his own note that Nicholas was able to attend to grooming and hygiene, perform household chores and other family responsibilities, and engage in age-appropriate activities. Id.

The ALJ thought the "plausible explanation" for the difference between IQ test results in 1997 and 2000 was Nicholas's "variable attention and concentration related to his attention deficit hyperactivity disorder." She found no indication in Dr. Tibbitts' report that Dr. Tibbitts knew of Nicholas's diagnosis of ADHD; this, in combination with Nicholas's hearing testimony that he went off his ADHD medication during the summer and the fact that Dr. Tibbitts tested Nicholas in the summer, led the ALJ to conclude

14 - FINDINGS & RECOMMENDATION

that Dr. Tibbitts' examination was not "an accurate depiction of the claimant's abilities, but rather reflects the hiatus in the claimant's medication." Tr. 27. The ALJ thought "[t]his is confirmed by the claimant's grade level testing which advanced a full grade level from the time of Dr. Tibbitts' examination to six months later after medication had been resumed." Id.[2]

The ALJ noted that the agency's reviewing sources had not endorsed a diagnosis that Nicholas suffered from mild mental retardation, concluding that borderline intellectual functioning was a more appropriate diagnosis. Id.

The ALJ disbelieved the testimony of Nicholas and his parents, finding that they "overstate[d] the nature and severity" of Nicholas's physical problems. The ALJ based this finding on Dr. Selden's note of July 11, 2002, in which Nicholas reported a "poor tolerance to sports." The ALJ found that this indicated that Nicholas had not "ceased such activities." Tr. 28. The ALJ also noted a November 8, 2001 chart note from Dr. Selden in which he said Nicholas was "doing well with full function. There are no problems with gait, running, or lower extremity function." Id.

The ALJ further found that although Nicholas had scoliosis, "which is degenerative," the condition "is progressing very slowly and there does not appear to have been any significant change in the claimant's underlying medical pathology between November 2001 and July 2002 that might account for the significant increase in

---

[2] The ALJ provided no citation to the record to support this finding. The record shows that Nicholas did advance a full grade level between July 2000 and January 2002, but the interval between tests was 18 months, not six months.

15 - FINDINGS & RECOMMENDATION

subjective complaints he reports." <u>Id.</u> For this reason, the ALJ did not find the testimony about Nicholas's motor functioning to be "entirely persuasive."

And finally, the ALJ found that even if Nicholas's complaints were accepted as generally credible, "his allegations do not indicate a 'marked' level of physical impairment. The claimant is able to attend school, bathe and dress himself, and otherwise carry out routine age-appropriate activities in an independent manner." <u>Id.</u>

## Standards

When evaluating disability for children, the Commissioner is required to determine whether the child has a medically determinable impairment that meets, medically equals, or functionally equals one of the impairments in the Listing found at Part 404, Subpart P, Appendix 1. 20 C.F.R. § 416.924(d). Functional limitations comprise the following six domains: 1) acquiring and using information; 2) attending and completing tasks; 3) interacting and relating with others; 4) moving about and manipulating objects; 5) caring for oneself; and 6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1)(i)-(vi). A medically determinable impairment or combination of impairments functionally equals a listed impairment if it results in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(e)(2). A "marked" limitation will be found in a domain when the impairment "interferes seriously with" a claimant's ability to independently initiate, sustain, or complete activities. (e)(2)(i).

The decision whether to remand for further proceedings turns

16 - FINDINGS & RECOMMENDATION

upon the likely utility of such proceedings. <u>Harman v. Apfel</u>, 211 F.3d 1172, 1179 (9th Cir. 2000). A remand for further proceedings is unnecessary if the record is fully developed and it is clear from the record that the ALJ would be required to award benefits. <u>Holohan v. Massinari</u>, 246 F.3d 1195, 1210 (9th Cir. 2000). In cases in which it is evident from the record that benefits should be awarded, remanding for further proceedings would needlessly delay effectuating the primary purpose of the Social Security Act—i.e., to give financial assistance to disabled persons because they cannot sustain themselves. <u>Id.</u>

In <u>Smolen v. Chater</u>, 80 F.3d 1273, 1292 (9th Cir. 1996), the court held that improperly rejected evidence should be credited and an immediate award of benefits be made when: 1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, 2) there are no outstanding issues that must be resolved before a determination of disability can be made, and 3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

If the <u>Smolen</u> test is satisfied, then remand for payment of benefits is warranted regardless of whether the ALJ *might* have articulated a justification for rejecting the doctor's opinion. <u>Harman</u> at 1173 (emphasis in original).

**Discussion**

The Commissioner concedes that the ALJ failed to comply with the Appeals Council's order that she obtain supplemental medical expert testimony to clarify the nature and severity of Nicholas's impairments and to help determine whether they met, medically equaled, or functionally equaled one of the listed impairments.

17 - FINDINGS & RECOMMENDATION

However, she asserts that the record, as it stands, does not require a finding of disability "given the uncertain implication of the unresolved issues." Defendant's Memorandum, p. 8. The Commissioner does not concede error with respect to the ALJ's consideration of Nicholas's functional limitations, or the testimony of Nicholas and his parents. Id.

Mr. Jenkins contends that the ALJ's decision must be reversed for an award of benefits because the ALJ erred in refusing to find that Nicholas has Mild Mental Retardation, and in failing to find that Nicholas meets, equals, or functionally equals a listed impairment. Mr. Jenkins asserts that Nicholas's impairments meet or functionally equal Listing 112.05, Mental Retardation:

> Characterized by significantly subaverage general intellectual functioning with deficits in adaptive functioning. The required level of severity for this disorder is met when the requirements in A, B, C, D, E, or F are satisfied.
> * * *
> D. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant limitation of function, or
> E. A valid verbal, performance, or full scale IQ of 60 through 70 and:
> ***
> 2. For children (age 3 to attainment of age 18) resulting in at least one of paragraphs B2b or B2c or B2d of 112.02.

Paragraphs B2b, B2c, and B2d of § 112.02 provide:

> b. Marked impairment in age-appropriate social functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) ... or
> c. Marked impairment in age-appropriate personal functioning, documented by history and medical findings (including consideration of

18 - FINDINGS & RECOMMENDATION

> information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, appropriate standardized tests; or
> d. Marked difficulties in maintaining concentration, persistence, or pace.

Mr. Jenkins contends that Nicholas's IQ testing satisfies Listing 112.05's requirement of scores between 60 and 70, and Dr. Tibbitts' opinion that Nicholas has marked difficulties in maintaining concentration, persistence and pace, along with the ALJ's finding that Nicholas also has "severe" impairments in the form of ADHD and scoliosis satisfy the second requirement.

> 1. Did the ALJ err in finding that Nicholas's mental impairment was borderline intellectual functioning rather than mild mental retardation?

The Commissioner acknowledges that ALJ Kingrey erred by failing to comply with the Appeals Council's order that she obtain supplemental medical expert testimony, but does not concede error in the ALJ's finding that Nicholas's mental impairment was borderline intellectual functioning rather than mild mental retardation. ALJ Kingrey's finding of borderline intellectual functioning was premised on her rejection of Dr. Tibbitts's findings and on her adoption of the findings of Dr. Pearson.

Under Social Security regulations, IQ test results must be current for accurate assessment under Listing 112.05. 20 C.F.R. Pt. 404, Subpt. P, App. 1, 112.00(D)(10):

> Generally, the results of IQ tests tend to stabilize by the age of 16. Therefore, IQ test results obtained at age 16 or older should be viewed as a valid indication of the child's current status, provided they are compatible with the child's current behavior. IQ test results obtained between ages 7 and 16 should be considered current for 4

19 - FINDINGS & RECOMMENDATION

years when the tested IQ is less than 40, <u>and for 2 years when the IQ is 40 or above.</u>

<u>Id.</u> (emphasis added). Under this regulation, Dr. Pearson's 1997 IQ test results were only current for two years, or until 1999,[3] while Dr. Tibbitts' test results were current until 2002. ALJ Kingrey's adoption of Dr. Pearson's invalid test results was legally erroneous.

I also find error in ALJ Kingrey's rejection of Dr. Tibbitts' IQ test results. She concluded that Nicholas's IQ test results were not indicative of mild mental retardation because the verbal and full scales of 69 were only one point below the cut-off for mild mental retardation, leading her to find that they were within the "typical range of standard deviation in such tests [of] plus or minus two or three points." However, the ALJ does not cite, and I have been unable to find, any legal authority permitting the ALJ unilaterally to raise IQ scores by two or three points. Further, the ALJ's finding is directly contradicted by Dr. Tibbitts' statement in his report that the difference between Nicholas's verbal and performance scores "was not significant" because the sub-test scaled scores were "fairly consistent at the low level."

The ALJ's other stated reason for rejecting the findings of Dr. Tibbitts was that she thought the lower scores obtained by Dr. Tibbitts in July 2000 were the result of Nicholas's having gone off his ADHD medications in the summer. To support this finding, the ALJ pointed to the alleged increase in Nicholas's achievement by a full grade level six months later. There is no evidence in the

_____

[3] The fact that the IQ test itself was significantly out of date further weakens the validity of Dr. Pearson's results.

20 - FINDINGS & RECOMMENDATION

record to support this finding. First, Dr. Pearson's IQ test results were also obtained in July. Second, pediatric neurologist Dr. Ireland concluded, after Ritalin therapy proved ineffective, that he did not think medical therapy would be "terribly effective" in assisting Nicholas with either academic performance or controlling his behavior, because his problems were based on encephalopathy. And third, as discussed below, Nicholas's advancement of a full grade level occurred 18 months after Dr. Tibbitts' testing, not six months later.

The ALJ's finding that Nicholas's mental impairment was at the Borderline rather than Mild Mental Retardation level was also based on the comments of reviewing psychologist Frank Lahman. Dr. Lahman opined, on the basis of the November 7, 2000 report from Nicholas's counselor, that Nicholas was "performing at the 9th grade level." Tr. 715. However, Dr. Lahman is clearly in error: not only is this statement contradicted by the results of the achievement tests administered by Dr. Tibbitts only four months previously (basic skills at fourth grade level, reading skills at fifth grade level, writing skills at third grade level, mathematics skills at fifth grade level), it is contradicted by Nicholas's achievement tests 18 months later, in 2002, which show him functioning at sixth grade level in math and reading and fourth grade level in written language skills.

Because the ALJ's rejection of Dr. Tibbitts' findings and opinions are legally erroneous and not based on substantial evidence in the record, the question is whether Dr. Tibbitts' report should be credited as true.

In general, when the evidence is strongly in the claimant's

21 - FINDINGS & RECOMMENDATION

favor and the equities are against further delay, the court should apply this prudential rule. See <u>Lester v. Chater</u>, 81 F.3d 821, 834 (9th Cir. 1996)(court credited treating opinion as true where an abundance of evidence supported that interpretation and where claimant had waited 12 years for resolution of the claim). In <u>Harman</u>, 211 F.3d at 1178-79, the court rejected the Commissioner's argument that when the record contains evidence capable of supporting the rejection of medical opinions, the court should not accept such medical evidence as true. The court noted language from <u>Varney v. Secretary of Health and Human Services (Varney II)</u>, 859 F.2d 1396, 1398-99 (9th Cir. 1988), where the court held that a claimant's pain testimony must be accepted as true when it is inadequately rejected by the ALJ, and held that the reasoning was equally applicable to medical evidence:

> Requiring the ALJs to specify any factors discrediting a claimant at the first opportunity helps to improve the performance of the ALJs by discouraging them from reach[ing] a conclusion first, and then attempt[ing] to justify it by ignoring competent evidence .... [And] the rule [of crediting such testimony ensures that deserving claimants will receive benefits as soon as possible .... Certainly there may exist valid grounds on which to discredit a claimant's pain testimony .... But if grounds for such a finding exist, it is both reasonable and desirable to require the ALJ to articulate them in the original decision.

I conclude that under this standard, the opinions of Dr. Tibbitts should be credited as true. ALJ Kingrey was ordered by the Appeals Council to obtain supplemental medical evidence, but failed to do so. She then failed to give proper reasons for rejecting the opinions of Dr. Tibbitts, the medical expert from the earlier hearing. If there are valid grounds on which to reject Dr. Tibbitts's opinions, the Commissioner has now had two opportunities

22 - FINDINGS & RECOMMENDATION

to discover them. It would be inequitable to the claimant to give the Commissioner yet another opportunity. See <u>Benecke v. Barnhart</u>, 379 F.3d 587, 595 (9th Cir. 2004)("Allowing the Commissioner to decide an issue again would create an unfair 'heads we win; tails, let's play again' system of disability benefits adjudication.")

Crediting Dr. Tibbitts' opinions means that Nicholas has satisfied the first requirement of Listing 112.05, which is a valid verbal, performance, or full scale IQ score of 60 through 70.

I turn now to the question of whether there remains an outstanding issue on whether, in addition to the valid IQ scores, Nicholas has a physical or other mental impairment imposing an additional and significant limitation of function, or, alternatively, one of the following: 1) marked impairment in age-appropriate social functioning, documented by history and medical findings; or 2) marked impairment in age-appropriate personal functioning; or 3) marked difficulties in maintaining concentration, persistence, or pace.

Dr. Tibbitts testified at the February 2000 hearing that Nicholas had had a "marked" impairment in concentration, persistence and pace since the date of Dr. Pearson's evaluation. The ALJ gave no reason for rejecting Dr. Tibbitts' opinion. I therefore recommend that it be credited as true.[4]

Further, the ALJ herself found that Nicholas was impaired by ADHD. The diagnostic criteria of ADHD describe deficiencies in

---

[4] Dr. Tibbitts' opinion is supported by Nicholas's score of 69 on the Freedom from Distractibility Index, of the WISC-III, a score that is at the 2nd percentile, two standard deviations below the mean for that test. Tr. 711.

23 - FINDINGS & RECOMMENDATION

concentration, persistence and pace. They include "often" 1) failing to give close attention to details or making careless mistakes in schoolwork, work, or other activities; 2) having difficulty sustaining attention in tasks; 3) failing to follow through on instructions and failing to finish schoolwork; 4) having difficulty organizing tasks and activities; 5) avoiding, disliking, or being reluctant to engage in tasks that require sustained mental effort; and 6) being easily distracted by extraneous stimuli. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (4th ed. Text Revision) 92 (DSM-IV).

This evidence meets the requirements of Listing 112.02B(2)(d), and therefore satisfies the second prong of Listing 112.05.

2.   Are the ALJ's credibility findings valid?

Once a claimant shows an underlying impairment and a causal relationship between the impairment and some level of symptoms, clear and convincing reasons are needed to reject a claimant's testimony if there is no evidence of malingering. Smolen, 80 F.3d at 1281-82.

A claimant's testimony about pain may be disregarded if it is unsupported by medical evidence which supports the *existence* of such pain, although the claimant need not submit medical evidence which supports the *degree* of pain. Bunnell v. Sullivan, 947 F.2d 341, 347 (9th Cir. 1991)(en banc). See also Vertigan v. Halter, 260 F.3d 1044 (9th Cir. 2001)(fact that claimant's testimony not fully corroborated by objective medical findings, in and of itself, is not clear and convincing reason for rejecting it).

The ALJ's rejection of the testimony from Nicholas and his parents about pain because it was "there does not appear to have

24 - FINDINGS & RECOMMENDATION

been any significant change in the claimant's underlying medical pathology between November 2001 and July 2002 that might account for the significant increase in subjective complaints" falls afoul of this rule. The record amply demonstrates that Nicholas has a condition, scoliosis, a condition which causes pain. Nicholas is not required to provide objective medical evidence for the *degree* of pain he alleges-- he is only required to show, as he has, the existence of a condition which could reasonably be expected to cause some pain. The ALJ's finding on this basis was erroneous.

When making her findings, the ALJ is required to read the statements of physicians in the context of the overall diagnostic picture, reading the notes in full and in context. Holohan, 246 F.3d at 1205. The ALJ rejected the testimony of Nicholas and his parents on the basis of two notes from Dr. Selden, the surgeon who removed Nicholas's tumor. The first note was dated November 8, 2001, shortly after Dr. Selden removed the spinal tumor, and states that Nicholas is "doing well with full function. There are no problems with gait, running, or lower extremity function." However, Dr. Selden's note continues: "He does have some occasional interscapular pain, for which he is not taking any medication." Tr. 731.

Dr. Selden's November 2002 chart note, a year post-surgery, also contains some additional comments, not quoted by the ALJ: "[A]lthough he complains of generalized poor tolerance to sports, mostly related to mid and low thoracic pain, he is having no focal or frank weakness ever since surgery. ... If spinal fusion is needed for his progressive low thoracic pain and spinal deformity, it would be okay for them to proceed with this." Tr. 752. Clearly

25 - FINDINGS & RECOMMENDATION

Dr. Selden was convinced of the pain's existence enough to consider surgery a viable treatment option. Further, the record reflects that Nicholas's scoliotic curve re-progressed from 36° after the surgery, a significant improvement, to 43°.

The ALJ's findings do not reflect Dr. Selden's notes in full and in context. Moreover, when the entire medical record is analyzed, there is no substantial evidence to support the ALJ's finding that Nicholas's testimony about pain and limitations caused by the back brace was not credible. See, e.g., tr. 459 (Nicholas required to wear back brace 23 hours a day until he attained skeletal maturity); tr. 507 (complaint of pain from brace on December 5, 1998); tr. 511 (complaint of pain from brace on January 13, 1999); tr. 511 (chart note dated January 13, 1999 that range of movement limited, forward bending caused pain); tr. 516 (note dated July 9, 1999 that back brace limited truncal and pelvic motion); tr. 548 (note dated February 19, 2000 that scoliosis causing functional problems with back pain).

There is no evidence of malingering in the medical record. I conclude that the ALJ's stated reasons for rejecting the testimony of Nicholas are not clear and convincing. I further conclude that the ALJ's disbelief of Nicholas's parents is not based on substantial evidence in the record.

In Benecke, 379 F.3d at 593, the court made it clear that when the Harman test for remanding for payment of benefits is met, the court does not remand solely to allow the ALJ to "make specific findings regarding excessive pain testimony." Rather, the court takes the relevant testimony to be established as true and remands for an award of benefits. Id. I recommend, therefore, that the

26 - FINDINGS & RECOMMENDATION

testimony of Nicholas and his parents be credited as true.

## Conclusion

I conclude that the test for remanding for benefits rather than for additional administrative proceedings has been met. The ALJ has failed to provide legally sufficient reasons for rejecting the evidence of Dr. Tibbitts and the testimony of Nicholas and his parents; if that testimony is credited, it is clear from the record as a whole that the ALJ would be required to find Nicholas disabled; and there are no outstanding issues that must be resolved before a determination of disability can be made. I recommend that this case be reversed and remanded for the payment of benefits.

## Scheduling Order

The above Findings and Recommendation will be referred to a United States District Judge for review. Objections, if any, are due April 8, 2005. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date. If objections are filed, a response to the objections is due April 22, 2005, and the review of the Findings and Recommendation will go under advisement on that date.


Dated this 24th day of March, 2005.


/s/   Dennis J. Hubel
Dennis J. Hubel
United States Magistrate Judge

27 - FINDINGS & RECOMMENDATION